**In re AIR CRASH DISASTER AT WASHINGTON, D.C. ON JANUARY 13, 1982.**

**Misc. No. 82–0055.**
**MDL No. 499.**

United States District Court,
District of Columbia.

March 3, 1983.

See also, D.C., 562 F.Supp. 383.

Donald W. Madole, Chairman, Washington, D.C. (argued), Milton G. Sincoff, New York City (argued), George E. Farrell, Washington, D.C., for Plaintiffs' Steering Committee.

George N. Tompkins Jr., (argued), Desmond T. Barry, Edward De Vivo, Condon & Forsyth, New York City, Moffett B. Roller, Cynthia J. Larsen, Condon & Forsyth, Washington, D.C., for defendant Air Florida, Inc.

Walter E. Rutherford, Haight, Gardner, Poor & Havens (argued), New York City, William G. Schaffer, Jones, Waldo, Holbrook & McDonough, Washington, D.C., for defendant American Airlines, Inc.

William A. Gould, Elizabeth S. Merritt, Perkins, Coie, Stone, Olson & Williams, Washington, D.C., Keith Gerrard (of counsel), John D. Dillow (of counsel; argued), Thomas J. McLaughlin (of counsel), Perkins, Coie, Stone, Olson & Williams, Seattle, Wash., for defendant The Boeing Co.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Before the Court is the motion of defendant Air Florida, Inc., seeking reconsideration of those portions of this Court's Memorandum Opinion and Order of February 17, 1983 determining that, with respect to the majority of the actions in this consolidated proceeding, the law of the State of Washington shall govern the question of defendant The Boeing Company's liability for an assessment of punitive damages. Air Florida argues that under the applicable analysis, the law of the District of Columbia shall govern that issue. In the alternative, Air Florida seeks severance of the punitive damages issue from the liability trial or certification of the decision for interlocutory appeal. Because of the proximity of the scheduled trial date, the parties were directed to respond to the motion by noon, March 2, 1983. Boeing opposes the motion; the Plaintiffs' Steering Committee concurs with Air Florida, to the extent that Air Florida's motion supports the Plaintiffs' Steering Committee's previous position that District of Columbia punitive damages law shall apply to all defendants in all actions. Defendant American Airlines, Inc. has not filed an opposition to the motion. The arguing parties have briefed the issue more than adequately.

Choice of law questions in air disaster cases often have proven difficult of resolution. In *In Re Paris Air Crash of March 3, 1974*, 399 F.Supp. 732 (C.D.Cal.1975), Judge Pierson M. Hall, certainly one of the nation's most experienced judges in aviation cases, stated that

> The law on "choice of law" in the various states and in the federal courts is a veritable jungle, which, if the law can be found out, leads not to a "rule of action" but a reign of chaos dominated in each case by the judge's "informed guess" as to what some *other* state than the one in which he sits *would* hold *its* law to be.

399 F.Supp. at 739. The Ninth Circuit once referred to the process of determining the law to be applied as involving an entry into "the wilderness in which courts sometimes find themselves when searching for solutions to problems arising under the judicial nightmare known as Conflict of Laws." *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 609 (9th Cir.1975). Many have concluded that the only resolution of this recurring problem is by Congressional enactment of a uniform, national law governing airline tort liability. *E.g., In Re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 632–33 (7th Cir.1981), *see also* Kennelly, *Litigation Implications of the Chicago O'Hare Airport Crash of American Airlines Flight 191*, 15 J.Mar.L.Rev. 273, 297–300 (1982). In an effort to resolve the problem in advance of legislative action, some courts have looked to federal common law or federal aviation regulations as a source of uniform principles. *E.g., Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400, 403–05 (7th Cir.1974), *cert. denied, Forth v. Alle-*

*gheny Airlines, Inc.,* 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 470 (1975) (federal common law rule of contribution and indemnity—decided by court to be a comparative fault rule—would control in light of pervasive federal regulation of aviation); *Paris Air Crash,* 399 F.Supp. at 746–47, 750–53 (federal interest evident to court in light of federal regulation of aviation, citing *Kohr* and Title 14, C.F.R. and appending relevant sections thereof to opinion; federal interest met by application of California law).

Indeed, in *Chicago,* the Seventh Circuit found it impossible under the governing choice of law rules to discern the law that properly applied to the question of the defendant manufacturer's liability for punitive damages. Employing the interest analysis approach of the Restatement, Second, of the Law of Conflict of Laws, that court found that the two states having the greatest interest in the matter were Missouri, the manufacturer's principal place of business, and California, where the plane was built. 644 F.2d at 613–14. Yet between these two states, the court concluded that neither's interest could be said to be greater than the other's. *Id.* at 615. Since Missouri law permitted an award of punitive damages while California law did not, the Seventh Circuit was faced with a true conflict. As the court decided that there seemed to be no way to escape from that conflict by reaching a "moderate and restrained" interpretation of either state's policy, the problem simply could not be resolved under the Restatement, Second interest analysis. *Id.* As a result, the Seventh Circuit was forced to go outside of the established choice of law principles and chose the law of a state acknowledged to be less interested, Illinois, the site of injury, to break the tie. *Id.*

In the absence of Congressional action or a decision of the Court of Appeals for this Circuit or the Supreme Court, this Court is constrained by the principles so aptly labeled by the Ninth Circuit a "judicial nightmare." This is not to say that the principles to which this Court is bound are in all cases necessarily unworkable. No party to the instant action has argued that, nor is it the view of this Court that a correct and fair resolution of these issues cannot be reached in this proceeding under the present rules. On the contrary. Recognizing this, the Court welcomes the opportunity to reconsider its prior decision in light of the arguments now before it and appreciates the fact that the pending motion provides the vehicle for that review.

Although Air Florida does not suggest any defect in the approach used by the Seventh Circuit in *Chicago,* the essence of its argument is that in seeking to determine the law applicable to the instant litigation this Court did not simply consider the legal reasoning of *Chicago* but also transposed the factual application of that analysis to the different facts of the case at bar. Air Florida also challenges the Court's selection of Washington State as the locus of Boeing's allegedly wrongful conduct, to the extent that such conduct complained of includes Boeing's alleged failure to warn Air Florida of dangers, which warnings need not have been made in that state. Air Florida does not disagree with this Court's conclusion that the two jurisdictions most interested in this issue are the District of Columbia and Washington State. Nor does Air Florida argue that the Court did not apply the proper choice of law principles. Air Florida's narrow challenge primarily focuses on the extent to which this Court found *Chicago* analogous to this case.

In response to Air Florida's motion, Boeing challenges Air Florida's standing to argue that punitive damages should be available against Boeing in that the airline is not a "party aggrieved" by an adverse ruling. However, the potential for jury confusion and prejudice are sufficient to establish on the part of Air Florida a stake in the resolution of the choice of law question as it affects the proceedings of the trial. Nevertheless, even if Air Florida did not have standing to raise the questions presented herein, the Court nonetheless could have entertained a reconsideration of its ruling *sua sponte.* Boeing also suggests that Air Florida in effect waived its right to argue the question of the law governing Boeing's liability for punitive damages because it did

not address the issue in its briefs or at oral argument. The Court finds otherwise. Certainly, in light of the alignment of the two parties on the same side of the case it would have made no more sense for Air Florida to argue for the application of a punitive damages law to Boeing than it would have for Boeing to argue the same with respect to Air Florida—which it did not. Air Florida's interest in the question arose only when this Court ruled that divergent punitive damages laws would govern these parties' liability.

With respect to the choice of law question itself, Boeing argues that the holding in *Chicago* is precisely on point, interpreting that holding as meaning that in a case such as this the state of injury (evidently as a matter of law) has a lesser interest in promoting its policies on punitive damages than either the state where the conduct allegedly occurred or the state in which the defendant had its principal place of business. Under *Chicago,* Boeing argues, the court should consider the interests of the state where injury occurred only where there is a conflict between the laws of the latter two jurisdictions.

There are a number of similarities between the facts of this case and those of *Chicago.* Both involved accidents which occurred upon takeoff. As such, in each case the state where the injury occurred had "very strong interests" in issues relating to the manufacturer's liability for punitive damages. 644 F.2d at 615. In each case no defendant had its principal place of business in the state of injury. Accordingly, in neither case could the state of injury be said to have had an interest in protecting the defendants from assessments of punitive damages. Similarly, in each case the aircraft was built or designed in a state other than the state of injury. Consequently, with respect to this issue neither state would have had a superior interest in such extraterritorial conduct causing injury within its borders, unless one of those states had a policy of punishing such conduct—which it would if its law provided for punitive damages.

There lies the rub. This is where the facts of the instant case depart from those of *Chicago.* Illinois' interest in the DC–10 manufacturer's liability for punitive damages vis a vis the interest of the other two potentially interested states, Missouri and California, was not as great as is the District of Columbia's interest in Boeing's liability vis a vis the interest of Washington State. Since Illinois did not impose punitive damages, Illinois would not have been disturbed by the application of California's equivalent law to the action. On the other hand, applying Missouri law would not have concerned it either, inasmuch as Illinois, as home of none of the defendants, had no interest in shielding any party from punitive damages. In the instant case, however, the policies of the District of Columbia of preventing air disasters and promoting safe air travel are advanced by the District's decision to allow punitive damage assessments in actions such as this. Those policies would be offended by resort to Washington's law, which denies such awards. As a result, unlike Illinois' interest in *Chicago,* the District of Columbia's interest in the question of Boeing's liability for punitive damages is by no means subordinate to that of the State of Washington. As another result, because the dilemma which forced the Seventh Circuit to look outside interest analysis is not present here, that analysis remains workable and useful toward resolving the instant choice of law problem.

As noted above, Air Florida disputes the extent to which Boeing's conduct can be said to have been located in Washington State. According to Air Florida, if the site of injury is "almost always fortuitous," *Pittway Corp. v. Lockheed Aircraft Corp.,* 641 F.2d 524, 527–28 (7th Cir.1981), under this Court's reasoning Boeing's liability would always be protected by Washington State's policy against punitive damages.

Yet the inquiry as to the site of defendant's conduct is not an end in itself, but a part of the process of determining the defendant's nexus with the jurisdictions interested in the litigation. In the typical case where the site of an air crash is determined to be "fortuitous" that state is generally

not considered to be interested because it "might ... have no substantial relation to either the producer or the passenger." Reese, *The Law Governing Airplane Accidents*, 39 Wash. & Lee L.Rev. 1303, 1314 (1983). This process also embraces some due process considerations, on the theory that a manufacturer should not be exposed to the tort liability law of a jurisdiction when it could not reasonably foresee becoming subject to that law. Reese, *id.* at 1311–12.

Boeing has a much more substantial relationship to the District of Columbia than a manufacturer generally has to the site of injury in a typical "fortuitous crash" case. Boeing had to foresee that its small, short-haul 737 aircraft would be used for departures from Washington National Airport, one of the nation's busiest airports and a station limited by federal regulation to domestic flights of 1,000 statute miles or less. *See* 14 C.F.R. § 159.60 (1982). Certainly, the allegations against that defendant concern the aircraft's performance upon departure. Moreover, with respect to the allegations that Boeing failed to make proper warnings about the aircraft's takeoff performance, as noted above, the locus of any such alleged omissions need not be confined to the State of Washington.

Between the District of Columbia and the State of Washington, the former has the greater interest in the question of Boeing's liability for punitive damages in the instant litigation. While Washington State has made a considered choice not to allow the assessment of punitive damages, that choice necessarily includes a balancing of the interests of resident tortfeasors against the interests of that state in preventing harm caused by tortious conduct. Yet while Washington State, through its legislature, may weigh the rights of its own injured victims against its resident tortfeasors, the sovereignty of other states prevents it from placing on that scale the rights of those injured elsewhere. Accordingly, with respect to those actions in this litigation originally filed in jurisdictions following interest

analysis choice of law principles, the law of the District of Columbia shall govern the question of Boeing's liability for punitive damages.

In consideration of the foregoing, it is, by the Court, this 3rd day of March, 1983,

ORDERED, that the motion of defendant Air Florida, Inc., for reconsideration of the Memorandum Opinion and the Order of February 17, 1983 be and hereby is granted, the relief sought in the alternative accordingly hereby being denied, and it is

FURTHER ORDERED, that the same Memorandum Opinion and Order are hereby vacated and withdrawn, and it is

FURTHER ORDERED, that a substitute Memorandum Opinion, and an Order appropriate thereto, shall issue this date, in accordance with the instant Memorandum Opinion and Order, and it is

FURTHER ORDERED, that the Memorandum Opinion to issue this date will differ from that vacated this date only as to (1) the matters discussed at pages 43–46 of that prior opinion requiring amendment in light of this Order, (2) modifications elsewhere in the opinion made necessary by such amendments, and (3) certain alterations *sua sponte* determined appropriate in the text of footnote 36 of that opinion.

## MEMORANDUM OPINION

Before the Court are the several motions and "proposals" of the parties as to which state's law should govern the following issues to be resolved at the consolidated trial in this case: the defendants' liability for compensatory damages, apportionment of liability among defendants, and the defendants' liability for punitive damages. These questions of choice of law have been more than amply briefed, by all defendants, the Plaintiffs' Steering Committee (which is charged with responsibility for presenting the case at trial on behalf of all plaintiffs), and counsel for several of the plaintiffs whose individual actions were originally filed in other courts but transferred here.[1]

---

1. All actions arising from the air crash that

were filed in other United States District

A brief review of the facts surrounding this litigation is essential to a full appreciation of the complexity of the issues addressed herein.

This consolidated proceeding arises from the crash of a B–737 passenger jet (designed and built by The Boeing Company and operated by Air Florida, Inc.) in Washington, D.C. on January 13, 1982. The plane departed from Washington National Airport, located across the Potomac River from the city of Washington, in Arlington County, Virginia,[2] and was bound for Tampa and Fort Lauderdale, Florida. Snow was falling before and during the takeoff. Shortly after the plane left the runway, it hit the Rochambeau Memorial Bridge (the northbound span of what is popularly known as the 14th Street Bridge) connecting Arlington, Virginia and the District of Columbia, damaging several automobiles on the bridge and injuring or killing their occupants. It then fell into the icy waters of the Potomac River below, within the District of Columbia. Five people aboard the flight were pulled from the river to safety, tragically, however, over 70 others died. Most of the victims were residents of the District of Columbia or the states in which its suburbs lie, Maryland and Virginia; other victims were from Florida, Massachusetts, Pennsylvania, Georgia, and Texas. Rescuers from various authorities, including the District of Columbia, the United States Park Police, and Arlington County, went

into action as a result of the crash. The bridge, an interstate highway (Route I–395) owned by the District of Columbia and a major commuter route between the city of Washington and its Virginia suburbs, was damaged and remained closed for several days. By a horrible yet unrelated coincidence, within a half-hour of the plane crash a subway train of the Washington Metropolitan Area Transit Authority carrying a full load of passengers derailed in an underground tunnel. The derailment caused several fatalities and resulted in the partial disruption of the Metro subway system, which, like the 14th Street Bridge, is used by many commuters between the District of Columbia and Virginia. The closing of the bridge and the disruption of Metro service prompted the federal government to direct that "nonessential" employees working in the District of Columbia need not report for work for several days following.

Air Florida is a defendant in each of the cases embraced in the consolidated trial. The wrongdoing alleged against Air Florida centers around the actions of the cockpit crew and the procedures they followed before and during the takeoff, including their decisions regarding the necessity of undergoing additional wing deicing treatment before takeoff. Boeing likewise is a defendant in each case; in those cases wherein Boeing is not named in the complaint, Boeing has been impleaded by Air Florida.

Courts were transferred to this Court by the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407(a), for purposes of pretrial discovery proceedings. This Court, on June 2, 1982, appointed a Plaintiffs' Steering Committee of three attorneys, to conduct pretrial proceedings relating to liability for the crash, on behalf of all of the plaintiffs in all actions involving the crash that were filed in this Court directly or transferred here by the Multidistrict Panel. Pretrial Order No. 1, June 2, 1982. Discovery proceedings were ordered to be completed by January 31, 1983.

After discovery was substantially under way, the Court ordered, *sua sponte,* that all actions transferred for discovery by the Judicial Panel be transferred pursuant to Rule 11(b) of the Rules of Procedure of the Panel and 28 U.S.C. § 1404(a) for purposes of trial on all liability issues. Order of December 6, 1982. The Court also consolidated all actions, except for those

of plaintiffs claiming through victims of the crash who were Air Florida's crew members, for a single trial on liability issues to commence March 31, 1983. The Plaintiffs' Steering Committee, as previously constituted, was appointed to conduct the plaintiffs' case at trial. The "crew member plaintiffs," who, unlike all the other plaintiffs, did not sue Air Florida, have moved (through the appointed Crew Plaintiffs' Coordinating Counsel) to transfer their actions back to their transferor court, in the Southern District of Florida. That motion has been ordered held in abeyance until 60 days after the close of discovery. *Id.*

There is also before this Court a claim by the District of Columbia for property damage and for rescue and clean-up expenses, Civil Action No. 82–2506.

**2.** *See* note 22, *infra.*

The allegations against Boeing concern such matters as the design of the aircraft and its alleged tendency to "pitch up" upon takeoff in icy weather when adhering ice or snow may affect the wings' aerodynamics, and Boeing's alleged failure to issue proper warnings regarding such a phenomenon. American Airlines is a defendant in some cases for the reason that its employees at National Airport performed the deicing of the aircraft, pursuant to a maintenance contract with Air Florida. Those two parties assert that an indemnification provision in that contract should render Air Florida responsible for any activities of the American Airlines deicing crew that would create liability.[3] Air Florida's corporate headquarters are in the State of Florida. The corporate headquarters of Boeing are in the State of Washington, the site of the design, construction, and certification of the 737, as well as the original sale of the particular aircraft involved in the crash. American

Airlines has its corporate headquarters in the State of Texas.

■ There is no doubt that a number of states[4] have an interest in some or all of the issues to be adjudicated at the consolidated liability trial. Since federal subject matter jurisdiction arises from the parties' diversity of citizenship, this Court must follow the choice of law rules of the states where the various actions were originally filed. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *In Re Air Crash Disaster Near Chicago, Illinois on May 25, 1979,* 644 F.2d 594 (7th Cir.), *cert. denied, Lin v. American Airlines,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981) [hereinafter referred to as *Chicago* ]; *In Re Air Crash Disaster at Boston, Massachusetts on July 31, 1973,* 399 F.Supp. 1106 (D.Mass.1975) [hereinafter referred to as *Boston* ].[5] Therefore, the con-

3. Union Carbide, the manufacturer of the ethylene glycol deicing solution applied to the plane's wings by the American Airlines crew, and United Technologies, the manufacturer of the two Pratt & Whitney engines on the 737, have at times been defendants in some of the cases herein, but have been voluntarily dismissed from all cases. Until very recently, the United States of America was a defendant in all cases either through complaints by plaintiffs or third-party actions by Air Florida, but it since has been dismissed in all actions. The complaints and third-party complaints were premised upon the fact that Federal Aviation Administration employees provided air traffic control services to National Airport (which is owned by the federal government). The United States admitted no liability for the crash nor made any financial contribution in the course of obtaining dismissals from the other parties.

4. For simplicity, references to "states" or "a state" in this Memorandum Opinion include the District of Columbia.

5. Defendant Boeing argues that the choice of law rules of the District of Columbia should apply to certain cases originally filed in other states for the reason that the plaintiffs in those cases sought transfer to this district. While the doctrine of *Van Dusen v. Barrack* provides that an action transferred from the federal district court to another pursuant to 28 U.S.C. § 1404(a) generally is governed by the substantive law of the transferor court, it has been suggested that when such a transfer is made

upon motion of a plaintiff, that doctrine does not apply and the transferee court's choice of law rules should control. *Carson v. U-Haul Co.,* 434 F.2d 916, 918 (6th Cir.1970), *see also Boston,* 399 F.Supp. at 1122 n. 18. Wright, Miller, and Cooper, noting that the Supreme Court in *Barrack* reserved this question, 376 U.S. at 640, 84 S.Ct. at 821, stated that where a § 1404(a) transfer is effected upon the plaintiff's motion "it seems that the law of the transferee state should control." 15 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3846 at p. 234 (1976). Although this Court entered its transfer order *sua sponte,* it did follow a motion by the Plaintiffs' Steering Committee and joined in by several plaintiffs.

The courts generally have not followed the suggestion of Wright, Miller, and Cooper. *See, e.g., In Re Richardson-Merrell, Inc.,* 545 F.Supp. 1130, 1132, 1135 (S.D.Ohio 1982) (law of transferor state followed even though motion made by plaintiffs); *see also Alexander v. Richardson-Merrell, Inc.,* 541 F.Supp. 93 (S.D.N.Y.1982) (opinion of transferor court). In the few cases where the law of the transferee state was applied following the plaintiff's motion to transfer under § 1404(a), the transfer was sought for reasons other than or in addition to convenience of parties and witnesses, for example, to avoid dismissal for lack of personal jurisdiction. *E.g., Brown v. Merrow Machine Co.,* 411 F.Supp. 1162 (D.Conn.1976). Other cases involved actions against which the transferor state's statute of limitations had run. *E.g., Schenk v. Piper Aircraft Corp.,* 377

trolling choice of law rules are those of the District of Columbia, Georgia, Illinois, Maryland, Massachusetts, Pennsylvania, Texas, and Virginia.

Most of these jurisdictions (the District of Columbia, Illinois, Massachusetts, Pennsylvania, and Texas) have discarded the *lex loci delicti* or "site of the injury" rule in favor of tests involving an exploration of the interests of the various states having some relationship to the parties or the crash. Illinois, Massachusetts, Pennsylvania, and Texas each have specifically adopted the test of the Restatement, Second, of the Law of Conflict of Laws (1971).[6] The District of Columbia likewise has discarded the *lex loci* rule, but before the Restatement, Second was published. *Tramontana v. S.A. Empresa de Viacao Aerea Rio Grandense*, 350 F.2d 468 (D.C.Cir.1965), *cert. denied, Tramontana v. Varig Airlines*, 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966). As such, most of the reported decisions of courts employing District of Columbia choice of law rules do so without reference to the formulae set forth in the Restatement, Second. *See, e.g., Semler v. Psychiatric Institute of Washington, D.C.*, 575 F.2d 922, 924 (D.C.Cir.1978); *In Re Air Crash Disaster Near Saigon, South Vietnam on April 4, 1975*, 476 F.Supp. 521, 526 (D.D.C.1979). However, in a recent decision the District of Columbia Circuit used the factors enumerated in the Restatement, Second in applying the District of Columbia analysis. *Hitchcock v. United States*, 665

F.2d 354, 360–61 (D.C.Cir.1981), citing Restatement, Second §§ 145, 146. The Commonwealth of Virginia and the States of Georgia and Maryland have not formally discarded the *lex loci delicti* rule; the principles governing the cases transferred from those jurisdictions are discussed in part II of this Memorandum Opinion.

## I. Choice of Law Under the Modern Analysis

Modern choice of law analysis regards an examination not simply of the various states' interests generally, but of their interests regarding the various distinct issues to be adjudicated. This is the concept of "dépeçage," and has been followed in other air crash cases. *Chicago*, 644 F.2d at 594; *Reyno v. Piper Aircraft Co.*, 630 F.2d 149 (3d Cir.1980), *rev'd on other grounds*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). The issues to be resolved at the consolidated trial, as noted above, include the questions of the defendants' liability for compensatory damages (in other words, whether their conduct created tort liability) and their liability for punitive damages. Within the question of liability for compensatory damages are the sub-issues of negligence, of whatever products liability lies on the part of Boeing, and of the method of apportioning liability or determining contribution among the defendants.

The District of Columbia method of "governmental interest analysis" directs the

---

F.Supp. 477, 480 (W.D.Pa.1974), *aff'd mem.*, 521 F.2d 1399 (3d Cir.1975); *Les Schwimley Motors, Inc. v. Chrysler Motors Corp.*, 270 F.Supp. 418, 420–21 (E.D.Cal.1967). Neither of those features are present in the instant actions before this Court.

Moreover, the theory of Wright, *et al.* has been criticized (see Note, Choice of Law in Federal Courts after Transfer of Venue, 63 Cornell L.Rev. 149, 154–59 (1977)), and the Sixth Circuit apparently has abandoned it. *Martin v. Stokes*, 623 F.2d 469, 471 (6th Cir.1980) (as regards choice of law rules to use "it should make no difference" which party made the motion; determining factor is whether transfer was made under § 1404(a) for convenience or under § 1406(a) to cure defective venue). *Martin v. Stokes* recently was followed by another judge of this court in a well-reasoned opinion for the principle set forth in the above paren-

thetical. *Translinear, Inc. v. Republic of Haiti*, 538 F.Supp. 141, 143 (D.D.C.1982). This court will not depart from that reasoning; accordingly, the choice of law principles of the states in which the various actions were first filed shall govern those individual actions.

6. *Evra Corp. v. Swiss Bank Corp.*, 522 F.Supp. 820, 827 (N.D.Ill.1981), *rev'd on other grounds*, 673 F.2d 951 (7th Cir.1982), *see also Chicago*, 644 F.2d at 610–11; *Engine Specialties, Inc. v. Bombardier, Ltd.*, 605 F.2d 1, 19 (1st Cir.1979) (Massachusetts law); *Conservation Council of Western Australia, Inc. v. Aluminum Co. of America*, 518 F.Supp. 270, 281 (W.D.Pa.1981); *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796, 805 (1964); *Houston North Hospital Properties v. Telco Leasing, Inc.*, 688 F.2d 408, 409 (5th Cir.1982) (Texas law).

court first to identify the state policies underlying each law in conflict and second to decide which state's policy would be advanced by having its law apply. *Semler,* 575 F.2d at 924. Under the Restatement, Second formula, by comparison, the court endeavors to determine which state has the most significant relationship to the occurrence and parties with respect to the issue being considered. Restatement (Second) of Conflict of Laws § 145(1).[7] The potentially interested states are determined by looking to a list of contacts with the litigation— place of injury, place where conduct occurred, residence or domicile of parties, and center of the parties' relationship, if any— and evaluating the relative importance of the contacts with respect to the particular issue. *Id.,* § 145(2); *Hitchcock,* 665 F.2d at 360.[8] The Restatement, Second lists a number of factors relevant to choosing the applicable law; the most important of these in a tort case include the relevant policies of the forum and other interested states. *Id.* § 6;[9] *compare Saigon,* 476 F.Supp. at 526 (the court must consider whether the public policy of a particular legislature would be furthered, frustrated, or irrelevant if applied to the case at bar). As such, the state with the "most significant relationship" should also be that whose policy would be advanced by application of the law, *i.e.,* the state with the greatest interest in applying its law to the issue under the District of Columbia analysis.

### A. Negligence

As there is no conflict as to the negligence law among the various interested jurisdictions the Court will apply the negligence law of the District of Columbia.[10]

7. Section 145 of the Restatement, Second provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred.

(b) the place where the conduct causing the injury occurred.

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

8. Contacts serve only as one means to ascertain the relevance of the policies of a state. *Saigon,* 476 F.Supp. at 526 n. 11, citing *Semler.*

9. Section 6 of the Restatement, Second of the Law of Conflict of Laws provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

The importance of the factors listed in subsection (2) varies from field to field. For example, the "protection of justified expectations," while of substantial importance in a contract case, is a rather insignificant factor in a tort action, inasmuch as persons who cause injury (notably those committing unintentional torts) usually act without thinking about what law governs the legal consequences of such conduct. *See* Restatement (Second) of Conflict of Laws § 145, comment c.

10. In each of the conceivably interested states the elements of a negligence action are (1) a standard of care due to the plaintiff and a duty on the defendant's part to exercise it, (2) a breach of that duty, (3) a proximate causal connection between that breach and the injury complained of, and (4) actual harm or damage. *Hassan v. Hartford Insurance Group,* 373 F.Supp. 1385 (D.Del.1974); *Morrison v. Mac-Namara,* 407 A.2d 555 (D.C.App.1979); *Clark v. The Boeing Co.,* 395 So.2d 1226 (Fla.App. 1981); *Bradley Center, Inc. v. Wessner,* 161 Ga.App. 576, 287 S.E.2d 716, aff'd 250 Ga. 199, 296 S.E.2d 693 (1982); *Illinois Housing Development Authority v. Sjostrom & Sons, Inc.,* 105 Ill.App.3d 247, 61 Ill.Dec. 22, 433 N.E.2d 1350 (1982); *Cannon v. Sears, Roebuck & Co.,* 374

This issue resolved, the question of which state's products liability law to apply to the allegations against Boeing will be considered.

## B. Products Liability

As noted above, the allegations of products liability against Boeing are essentially that the design of the 737 aircraft's wings was defective in that the plane had a tendency to lose control or "pitch up" on takeoff when ice or snow became adhered to the leading edges of the wings, and that operating manuals for the 737 did not adequately advise the users of this phenomenon. Aside from the matter of the manuals' adequacy,[11] Boeing is also charged with failing to warn consumers of the alleged defective wing design.

In accordance with *Hitchcock* and section 145(2) of the Restatement, Second, the contacts to be considered include: (a) the site of injury, (b) the place where the conduct occurred, (c) the parties' domiciles, and (d) the place where the parties' relationship is centered. The Second Restatement further instructs that these contacts be evaluated according to their relative importance with respect to the particular issue; for example, while section 145(2)(c) lists residence of the parties as a relevant contact, with respect to the issue of tort liability, the states wherein the plaintiffs or victims resided have a negligible interest in regulating extraterritorial conduct causing injury outside their borders. Likewise, a simple mechanical application of these factors is inappropriate: the mere fact that one jurisdiction numerically satisfies more of these contacts than another is not dispositive of the question of which state has the "most significant relationship" regarding this issue. *See Chicago,* 644 F.2d at 613 (mere tabulation of states' interests insufficient); *see also Saigon,* 476 F.Supp. at 526 n. 11.

With respect to this issue of Boeing's liability, the jurisdictions having contacts to consider are: the District of Columbia (the place of injury), the State of Washington (the place of Boeing's alleged misconduct [12] and its principal place of business), and whatever state in which the relationship between the parties can be said to be centered. Guidance on the question of where the parties' relationship is centered as well as some direction as to the relative importance of each of the four contacts to the particular issue at hand is provided in Reese, *The Law Governing Airplane Accidents,* 39 Wash. & Lee L.Rev. 1303 (1983) [hereinafter cited as Reese, *Airplane Accidents*].

Professor Reese has developed a useful approach to determining the law to apply to the various issues likely to arise in an air crash action. According to Professor Reese, in an action by a passenger against an aircraft manufacturer the question of whether the manufacturer's conduct was liability-creating is governed by the law of (1) the place of manufacture or design, (2) the manufacturer's principal place of business, (3) the place of the flight's departure, or (4) the place of the flight's intended

---

Mass. 739, 374 N.E.2d 582 (1978); *Macina v. McAdams,* 280 Pa.Super. 115, 421 A.2d 432 (1980); *Mahavier v. Beverly Enterprises, Inc.,* 540 S.W.2d 813 (Tex.Civ.App.1976); *Atlantic Co. v. Morrisette,* 198 Va. 332, 94 S.E.2d 220 (1956); *Hojem v. Kelly,* 93 Wash.2d 143, 606 P.2d 275 (1980).

When the laws of the various jurisdictions are not in conflict, for reasons of judicial efficiency the law of the forum may be applied. A strict application of this rule would require the Court to refer to several perhaps differently articulated but essentially identical theories of law inasmuch as the various individual actions were filed in a number of forums. Because of the inevitable peculiarities of the multidistrict

proceeding, the negligence law to which this Court shall refer is the law of the transferee forum, the District of Columbia.

**11.** An allegation that there were defects in an aircraft encompasses an allegation that there were defects in its manuals. *Leachman v. Beech Aircraft Corp.,* 694 F.2d 1301, 1306 (D.C. Cir.1982). *See* note 16, *infra,* and accompanying text.

**12.** The 737 was designed, built, certified, and delivered in Washington State. *See* Purvis affidavit, Exh. B to Boeing's memorandum in opposition to Air Florida's motion, filed Nov. 5, 1982.

destination. Reese, *Airplane Accidents,* at 1310. Washington State, of course, is the site of the first two places, which are equivalent to alternatives (b) and (c) of the Restatement, Second's list of contacts in section 145(2). Places (3) and (4) in Professor Reese's analysis, which are the District of Columbia and Florida, are related to the question posed by contact (d) of the Restatement, Second (*i.e.,* where is the relationship of the parties centered), in that those places "necessarily bear some relationship to the plaintiff[s]" since they are where the plaintiffs began and intended to complete their journeys and since the manufacturer "would have good reason to foresee" that its planes would come to either place.[13] *Id.* at 1311–12. *See also Chicago,* 644 F.2d at 612 (while center of relationship "unclear," court noted probable importance of Illinois as site of departure and California as intended destination). The same difficulties as to determining the center of the parties' relationship are here just as in numerous other air crash cases involving allegations of a defective design created in a removed state. As between the District of Columbia and Florida, to the extent that the center of the parties' relationship can be discerned, the former is a more likely choice. The great majority of passengers were from the Washington, D.C. metropolitan area and were planning to return home

after the trip. Likewise, the victims on the 14th Street Bridge were local residents. Furthermore, the municipality itself is a plaintiff.

The importance of the sites of departure and intended destination vis a vis that of the manufacturer's domicile and place of manufacture and design also bears some relationship to contact (a) of the Restatement, Second; site of injury. Professor Reese comments that the relative importance of the place of intended destination is not usually great, unless the plane happens to crash upon arrival. *Id.* at 1312. Accordingly, Florida's interest in this issue as the scheduled arrival point can be further discounted under the Reese analysis, inasmuch as the plane did not crash while landing. The Reese analysis appears to imply that where the site of injury coincides with the site of departure (or intended arrival), the interest of the relevant state *qua* site of injury is less likely to be discounted as the "result of a fortuity." This is especially appropriate to the facts of the instant case, where the allegations of fault refer to the actions of flight and ground crew and the performance of the aircraft on takeoff. Consequently, the District of Columbia's interest as the place of departure[14] is augmented by its having been the place of

---

**13.** Despite National Airport's location on the Virginia side of the Potomac, the District of Columbia is more meaningfully considered the site of departure for the purposes of the analysis here. A literal application of the Reese approach conceivably could mean that the "place of departure" interest belongs to the Commonwealth of Virginia, on whose side of the Potomac River Washington National Airport lies. However, the precise physical location of National Airport does not answer the question of where the parties' relationship, with respect to this issue, is centered. The passengers on Flight 90 contracted for passage from Washington, D.C. to Florida. Flight 90, like all flights bound from Washington National Airport, was advertised and designated as a departure from Washington, D.C. Washington National Airport is the airport used by the vast majority of people traveling to or from Washington, D.C. by air. *Compare, e.g., Bernhard v. Harrah's Club,* 16 Cal.3d 313, 546 P.2d 719, 128 Cal.Rptr. 215 (1976) (since defendant, a Nevada casino located near California state line, had

advertised in and solicited trade from California, it had established a nexus with that state and voluntarily subjected itself to California tort law).

For these reasons, *inter alia,* the Court finds that the District of Columbia is appropriately considered the place of Flight 90's departure under the Reese approach and as that concerns section 145 of the Restatement, Second, of Conflict of Laws.

**14.** This is not to say that the Commonwealth of Virginia does not have an interest in the safe condition and operation of planes at National Airport. On the contrary, the circumstances of the airport create among the District of Columbia and Virginia a concurrent interest in this and many related issues. On the facts of this case, however, since the effect of the accident was felt to a much greater extent by the District of Columbia, the District's interests necessarily will be greater than Virginia's.

injury as well.[15] The potentially interested states having been identified, the Court now considers whether their laws are in conflict. The District of Columbia has adopted the doctrine of strict liability in tort for product defects. *Young v. Upright Scaffolds, Inc.,* 637 F.2d 810, 812–13 (D.C. Cir.1980), citing *Russell v. GAF Corp.,* 422 A.2d 989 (D.C.App.1980); Restatement (Second) of Torts § 402A (1965). Under this doctrine, a merchant who sells an unreasonably dangerous product to a consumer is liable for resultant injuries, regardless of fault, or privity of contract. *Id.* However, if the product is unreasonably dangerous only because of the manufacturer's failure to warn of possible dangers, the manufacturer's fault is relevant to the question of his liability. As such, the issue of a failure to warn is governed by a negligence standard. *Young,* 637 F.2d at 814; *Russell,* 422 A.2d at 991. Even so, to the extent that the plaintiffs' allegations refer to inadequate warnings or instructions in Boeing's operating manuals for the 737, a strict liability standard may yet apply. As the United States Court of Appeals for this Circuit recently stated, "an allegation that there were defects in the aircraft encompasses one that there were defects in the manuals. The latter class of defects constitutes a subset of the former." *Leachman v. Beech Aircraft Corp.,* 694 F.2d 1301, 1306 (D.C.Cir.1982).[16]

The policies advanced by the District of Columbia's adoption of these doctrines are several. The existence of law providing for tort liability in the District of Columbia demonstrates, first of all, the District's interest in regulating—and preventing—conduct that could cause tortious injury. W. Prosser, Law of Torts § 4, p. 22 (4th ed. 1971). Furthermore, the adoption of the rule of strict products liability evinces additional interests: to do away with the harsh common-law requirement of privity in products cases and to hold manufacturers of defective products to a higher standard than that of negligence. *See Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1355–57 (D.C.App.1978), *see also Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 377 P.2d 897, 27 Cal.Rptr. 697 (1962) (quoted with approval in *Berman* ).

Washington State recently has codified its judicially-acknowledged products liability law, by enacting the Washington Products Liability Act of 1981, Wash.Rev.Code §§ 7.72.010–.060 (1981).[17] This act estab-

---

**15.** The special case of the "bridge plaintiffs" is also addressed by Professor Reese. In actions by such third persons against an aircraft manufacturer, the candidate laws for governing the liability issue are those of: (1) the place of manufacture or design, (2) the manufacturer's principal place of business, and (3) the place of injury. Reese, *Airplane Accidents, supra,* at 1320. This third choice corresponds not only to the identical "contact" in the Restatement, Second, but, like the departure and destination points in the passenger actions, to the Restatement alternative of the place where the parties' relationship is centered as well. "[I]t is the only place that is certain to have a contact with both the producer and the plaintiff. *Id.* In this case, of course, that place is Washington, D.C.

**16.** The Court of Appeals observed:
"First, aircraft manuals are required by law to be in the plane, 14 C.F.R. § 91.31(b) (1982), so they are as much a part of the plane as if they were bolted to it. Second, the duty to manufacture a plane free of defects ... includes the duty to provide warnings and manuals that are also free of defects. Under products liability law, the plane's flight characteris-

tics may be unreasonably dangerous and give rise to liability unless accompanied by warnings as to the dangers .... Thus, in certain circumstances, an allegation that an aircraft is defective may mean that the warnings that were supplied were inadequate or defective." *Leachman v. Beech Aircraft Corp.,* at 1306. *See also Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 465 (5th Cir.1976); *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 100, 337 A.2d 893 (1975) (both quoted in *Leachman* ).

**17.** The section of the Act relevant to the instant inquiry provides:
7.72.030 Liability of manufacturers. (1) A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided.
(a) A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on

lishes a negligence standard for a manufacturer's failure to issue warnings concerning dangers discovered after manufacture. Wash.Rev.Code § 7.72.030(1)(c). Likewise, negligence is the standard as regards allegations that adequate warnings or instructions were not provided with the product to prevent harm resulting from dangers present at the time of manufacture. Wash. Rev.Code § 7.72.030(1)(b). Finally, design defects are also considered under a negligence standard. Wash.Rev.Code § 7.72.-030(1)(a). In the State of Washington, the strict liability standard only governs manufacturing defects and failures of a product to conform to the manufacturer's express warranties or the implied warranties created under Title 62A of the Revised Code of Washington. Wash.Rev.Code § 7.72.030(2).

While the newness of the Washington Products Liability Act of 1981 has resulted in a paucity of judicial interpretations thereof, the act's preamble conveniently provides a statement of the legislature's intent in enacting the statute. 1981 Wash. Laws ch. 27 § 1. The preamble notes first the process of tort reform in Washington and the resulting amelioration of the

"harshness of many common law doctrines." It then states that "The purpose of this amendatory act is to enact further reforms in the tort law to create a fairer and more equitable distribution of liability among parties at fault." *Id.* at ¶ 2. This evident interest in providing fair treatment for defendants is explicated in the paragraph immediately following, wherein the preamble refers to these effects of modern changes in products liability law: increased costs of consumer and industrial goods because of rising premiums for product liability insurance and the related "disincentives to industrial innovation and the development of new products." *Id.* at ¶ 3. The remainder of the preamble continues in this vein.

The PSC asserts that there is no actual conflict between the Washington and District of Columbia laws for two reasons. First, the PSC asserts that the standards that would govern the relevant allegations against Boeing are essentially the same under the laws of the District of Columbia and Washington in that the claim is one for a "failure to warn" which is subject to a negligence charge either way. PSC Reply

the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product.

(b) A product is not reasonably safe because adequate warnings or instructions were not provided with the product, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate.

(c) A product is not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured where a manufacturer learned or where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured. In such a case, the manufacturer is under a duty to act with regard to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonably care to inform product users.

(2) A product manufacturer is subject to strict liability to a claimant if the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or to the implied warranties under Title 62A RCW.

(a) A product is not reasonably safe in construction if, when the product left the control of the manufacturer, the product deviated in some material way from the design specifications or performance standards of the manufacturer, or deviated in some material way from otherwise identical units of the same product line.

(b) A product does not conform to the express warranty of the manufacturer if it is made part of the basis of the bargain and relates to a material fact or facts concerning the product and the express warranty proved to be untrue.

(c) Whether or not a product conforms to an implied warranty created under Title 62A RCW shall be determined under that title.

(3) In determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer.

Brief of Nov. 24, 1982, at 11–12. However, the PSC states that the "failure to warn" allegation also concerns the 737 operations manual, *id.* at 12, which, under *Leachman v. Beech Aircraft Corp.,* might well require analysis under a design defect theory. Moreover, in responding to Boeing's liability contention interrogatories, the plaintiffs have acknowledged that they indeed are proceeding on a theory of defective design. *See* Transcript of Hearing, Jan. 11, 1983, at 21 (comments of Chairman, Plaintiffs' Steering Committee), 22–23 (comments of counsel for Boeing). Furthermore, the question of Boeing's design of the 737 will in any case most likely be an issue at trial, inasmuch as this is an important part of Air Florida's case against Boeing. *See* Jan. 11, 1983 Transcript at 34–35 (comments of counsel for Air Florida re slotted wing slat design alternative). As the laws of the District of Columbia and Washington address design defects differently, a conflict is strongly suggested.

Second, the PSC argues that although the laws of the two jurisdictions may differ, the policies they effectuate, *i.e.,* the creation of a products liability doctrine not dependent on historical requirements of privity, are the same and that therefore District of Columbia law may be applied with no fear of a true conflict. The PSC cites an unreported opinion from this district, *Cunningham v. Textron, Inc.,* Civil Action No. 75–0318 (May 15, 1978) (order granting plain-

tiff's motion *in limine*) to the effect that where states having different products liability laws have demonstrated similar policies, no actual conflict exists. *Cunningham* indeed involved a "false conflicts" situation, because the three interested states all followed in substance (if not in name) the rule of strict liability.[18] In the case at hand, however, it can not be doubted that, with respect to design defects the two interested jurisdictions do not apply the same standard of care. Moreover, the two jurisdictions have expressed different policy objectives that are relevant to their particular interests in the parties. The decisions of the District of Columbia courts in strict products liability cases demonstrate a preeminent concern with the protection of plaintiffs. *See Berman v. Watergate West, Inc.,* 391 A.2d at 1355–58. As the plaintiffs in the instant case have a strong relationship with the District of Columbia, this is a real interest. Washington, to the contrary, has articulated in no indefinite terms its concerns about the effects of its products liability laws upon local defendants, particularly those defendants which are industrial or commercial concerns. Washington Products Liability Act of 1981, Preamble, 1981 Wash.Laws ch. 27 § 1. As Boeing is a Washington defendant, that state's interest in the application of its law likewise is material. Accordingly, the laws are in conflict[19] and this Court must determine which

**18.** Texas had adopted the strict liability doctrine of section 402A of the Second Restatement of Torts. No Utah state court had addressed the issue, but the Tenth Circuit had applied the doctrine on the theory that Utah would were it given the opportunity. Virginia's legislature had eliminated the privity requirement from warranty actions; judicial decisions resulting from that enactment had created a doctrine "identical" to strict liability. *Cunningham v. Textron, Inc.,* slip op. at 6.

**19.** This case is distinguishable from *Reyno v. Piper Aircraft Co.,* where the Third Circuit found that an asserted conflict between one jurisdiction's law of strict liability and another's of negligence was actually a false conflict. *Reyno* involved an air crash in Scotland of an aircraft manufactured in Pennsylvania. While Pennsylvania had a strict products liability law, Scottish law employed a negligence standard.

The court noted that strict liability and negligence serve the same policies of deterrence and compensation and differ only in where they strike the balance in searching for optimal deterrence of harmful conduct and allocating the costs of injuries among producers and consumers, negligence being more producer-protective and strict liability being more consumer-protective. 630 F.2d at 167. Scotland's interest associated with its negligence rule—encouraging industry by protecting manufacturers—was immaterial to the *Reyno* case inasmuch as the defendant did not engage in manufacturing in that country, and therefore was not impaired by the court's application of the stricter Pennsylvania standard. *Id.* at 168. In the instant case, however, Washington State is undoubtedly interested in having its more producer-protective rule govern the liability of its local defendant Boeing.

of the two jurisdictions has the "most significant relationship" to the relevant matters at hand.

Boeing argues that the products liability law of Washington State rather than the District of Columbia law should govern because any interest the District has relevant to this issue is diminished because it was "fortuitous" that the plane crashed and caused injury here.[20] Under this theory, since the site of injury resulting from a design or manufacturing defect is "almost always fortuitous," *Pittway Corp. v. Lockheed Aircraft Corp.,* 641 F.2d 524, 528 (7th Cir.1981), less weight should be given to

that state's concern because its interest in and ability to control or regulate wrongful conduct by deterrence or punishment or to protect defendants from liability is not as significant as that of the place of misconduct or principal place of business. *Chicago,* 644 F.2d at 615. No one disputes that as the abbreviated path of Flight 90 took it over the irregular shoreline of the Potomac River, the flight crossed the District of Columbia-Virginia boundary several times before the impact.[21] (The boundary between these jurisdictions has long been established as the high water mark of the Potomac on the Virginia side of the river.)[22]

---

**20.** Air Florida and American likewise assert that the "fortuity" of the crash reduces the District of Columbia's interests in issues concerning those defendants. *See* part I–D, *infra.*

**21.** According to a National Transportation Safety Board diagram appended by American Airlines to its November 15, 1982 memorandum as Exhibit A, Flight 90 began its departure on a runway at National Airport within the Commonwealth of Virginia. It was airborne by the time it passed over the land's end at the runway's terminus, at which point it crossed over an inlet of the Potomac River, which is in the District of Columbia. After this brief flight over District of Columbia waters, its path took it over a point where Virginia land again juts out into the river. Further on, the waterline evidently was just below the aircraft's route; as such, Flight 90 conceivably could have crossed the state line several times during this portion of the flight. Finally it hit the 14th Street Bridge at a point over the river and therefore in the District of Columbia, but a matter of feet away from Virginia.

The question of whether the relevant events happened in the District of Columbia or Virginia was a troubling matter to resolve in another case involving a fatal crash of a commercial passenger plane at or near Washington National Airport, *Union Trust Co. of District of Columbia v. United States,* 113 F.Supp. 80 (D.D.C. 1953) *aff'd in part and rev'd in part, United States v. Union Trust Co.,* 221 F.2d 62 (D.C. Cir.), *aff'd, United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). On November 1, 1949, an Eastern Air Lines DC–4, carrying 51 passengers and four crew members from Boston to Washington, collided with a Bolivian P–38 military plane while the passenger plane was "approximately 300 feet in the air on final approach on runway number 3 at the Washington National Airport, Washington, D.C." 113 F.Supp. at 81. *Lex loci delicti* being the law of the forum at the time, the question of where the accident occurred

was an important one as a Virginia statute then limited recovery for wrongful death to $15,000 while the District of Columbia had no statutory limit. The question was submitted to the jury. Commenting on the jury's finding that the accident "occurred in the District of Columbia," Judge McGuire noted that "This particular question was not easy of resolution." *Id.* at 85. The judge upheld the finding, noting "such pertinent and persuasive factors" leading to the jury's conclusion as, *inter alia,* "the narrowness, so to speak, of the geographical area involved in relation to the line of demarcation between the District of Columbia and the Commonwealth of Virginia." *Id.*

In that crash, the DC–4 was cut in two, its forward portion falling in the Potomac and the after portion on the Virginia shore. *Eastern Air Lines Inc. v. Union Trust Co.,* 221 F.2d 62, 64 (D.C.Cir.1955). The plane's landing pattern involved a southward path over Virginia to a point south of the city of Alexandria, then eastward until over the Potomac, then northwest to a distance northeast of Alexandria. *Id.* A map prescribing the landing pattern for Runway 3 and generally conforming to this description is found at 17 Fed.Reg. 7178 (Aug. 7, 1952); 14 C.F.R. § 60.18–7(h) (1952).

**22.** D.C.Code § 1–101(a) (Michie 1981) provides that "The District of Columbia is that portion of the territory of the United States ceded by the State of Maryland for the permanent seat of government of the United States, including the river Potomac in its course through the District, and the islands therein." The reach of Maryland's cession on January 24, 1791 to the District of Columbia was equivalent to that of the 1632 charter of Charles I granting Maryland to Lord Baltimore; to "the farther bank of the said [Potomac] river and following it." *Smoot Sand & Gravel Corp. v. Washington Airport, Inc.,* 283 U.S. 348, 350–51, 51 S.Ct. 474, 475, 75 L.Ed. 1109 (1931); *Marine Railway & Coal Co. v. United States,* 257 U.S. 47, 63, 42 S.Ct. 32, 33–34, 66 L.Ed. 124 (1921).

*Bruce v. Martin-Marietta Corp.,* 418 F.Supp. 829 (W.D.Okl.1975), *affirmed,* 544 F.2d 442 (10th Cir.1976) involved a crash typical of the kind usually found to be fortuitous. After departing Kansas, the Utah-bound plane crashed in Colorado. The plaintiffs were from Oklahoma and Kansas, and the defendant manufacturer, against whom there was a products liability claim, had its principal place of business in Maryland, where the allegedly defective aircraft was designed and manufactured. The court found that place of injury was of "relatively minor importance" to the issues of liability because the crash occurred while the plane was merely passing through Colorado. 418 F.Supp. at 832–33. The court concluded that Maryland had the most significant relationship to the issue of Martin-Marietta's liability and applied the law of that state. *Id.,* at 833. Similar results were reached in other cases involving crashes of transient aircraft. *E.g., Halstead v. United States,* 535 F.Supp. 782 (D.Conn.1982); *Melton v. Borg-Warner Corp.,* 467 F.Supp. 983 (W.D.Tex.1979); *O'Keefe v. Boeing Co.,* 335 F.Supp. 1104 (S.D.N.Y.1971). The *Chicago* court also noted a certain amount of fortuity in that case. In evaluating the various states' interests in the Chicago DC–10 crash, the Seventh Circuit suggested the nature of the supposed cause of the crash—allegedly wrongful conduct on the parts of the manufacturer and the airline maintaining the plane which resulted in cracked engine mounts, rendering the engines prone to falling off—meant that there was nothing special about the plane's presence in Illinois at the time of crash (with regard to the *defendants'* part in the litigation) and that "the injury might well have occurred in one of any number of states" on its route from Chicago to Los Angeles. 644 F.2d at 615. However, as explained below, this did not deprive Illinois of *all* interest in the *Chicago* crash. *See id.*

The fact that the site of injury might be fortuitous does not for every case answer the question of which state has the most significant relationship to this issue. Indeed, were that so, the *lex loci delicti* rule would simply be replaced by another equally rigid rule of *lex loci actus.* The unfairness of such a rule to those who suffered from the injury directly and indirectly is obvious, and denies what the Seventh Circuit recognized in *Chicago,* that the state where the injury occurred does have some interest in imposing liability on the wrongdoer, depending on the facts of the particular case. 644 F.2d at 615. This interest of the District of Columbia cannot be ignored inasmuch as its connection with the Flight 90 crash is much greater than the interests of the injury sites in the more typical "fortuitous crash" cases cited above. Unlike those cases, the instant case is not one where the injury might have occurred in "one of any number of states." Rather, the allegations as to the various defendants all concern the effect of their conduct on the *takeoff* procedure, which only involved but a portion of the scheduled Washington to Florida trip confined to some limited area centered upon Washington National Airport. Had Flight 90 cleared the bridge and proceeded on its way to Florida there is nothing to indicate that the alleged deficiencies of the 737's design or its operation by Air Florida would have jeopardized the flight's cruising at altitude or landing, inasmuch as those alleged problems are only relevant to takeoff.

---

Because no one could any longer be certain of the location of the January 24, 1791 high water mark, in 1945 Congress enacted a statute establishing the boundary between the District of Columbia and Virginia for law enforcement purposes as the existing mean high water mark as may be altered by natural or artificial forces. Act of Oct. 31, 1945, 59 Stat. 552. This statute was relied upon by the courts which have held that Washington National Airport is located in Virginia. *Pfister v. Director, Office of Workers' Compensation Programs,* 675 F.2d 1314, 1315 (D.C.Cir.1982), citing *Bryan v. District Unemployment Compensation Board,* 342 A.2d 45, 47 (D.C.App.1975). However, it has been held that the Act of 1945 did not establish a jurisdictional boundary between the District of Columbia and Virginia for all purposes, and that the boundary for some purposes, including court jurisdiction over certain actions involving title to land, remains the 1791 line. *United States v. Herbert Bryant, Inc.,* 543 F.2d 299, 303–04 (D.C.Cir.1976), citing *Smoot.* This case was not cited by the court in *Pfister.*

In fairness to Boeing's position, it must be recognized that the site of the crash was more fortuitous with respect to Boeing than with respect to Air Florida and American. Boeing's alleged defects could have manifested themselves upon any takeoff under the same circumstances present in the instant accident. However, one of the reasons for looking away from the site or injury in the typical "fortuitous crash" case is the concern of not holding a defendant manufacturer to a standard of law to which it could not foresee becoming subject. Reese, *Airplane Accidents,* at 1311–12. In a coast-to-coast flight, for example, it has been suggested that it would be unreasonable to require the manufacturer to govern its conduct in accordance with the laws of any state over which its product might pass. This problem is not present in the instant case. It is much more foreseeable that an aircraft with a takeoff deficiency would crash on departure from an airport that the manufacturer expected its plane would use than it is that a transient plane on an Oklahoma to Utah flight would crash in Colorado rather than either of those states or Arizona or New Mexico.

Furthermore, in the cases cited above an important reason why the sites of injury were determined fortuitous and therefore uninterested was that the plaintiffs had little or no connection with those states. Here, by contrast, the site of injury was Flight 90's site of departure. As such, many of the victims had some kind of settled relationship with the District of Columbia, be it residence, employment, or some other nexus, and the District of Columbia no doubt has an interest in protecting such individuals from harm. *See* Restatement (Second) of Conflict of Laws § 146, comment (e). Likewise, as suggested earlier, the District of Columbia has an interest in protecting those persons who use the services of its airport.[23] The instant case is distinguishable from the typical "fortuitous crash" cases cited above inasmuch as the crash sites in those cases had no relationship to the parties on either side.[24] The instant case is more like *Chicago* than those cases; as Illinois had an interest in the crash in light of the victims' relationship to Illinois and the severity of the disaster's impact on that state, so it is with the District of Columbia in the case at bar. Yet the District of Columbia has a greater interest in this litigation than Illinois had in *Chicago.* While the *Chicago* crash was purely fortuitous inasmuch as the DC–10's engine could have fallen off anywhere on that flight, 644 F.2d at 615, in the instant case the potential for harm was limited to the takeoff portion of a flight, which here was centered on National Airport.

The interest of the District of Columbia in regulating conduct so as to promote air safety is evidenced further by the aftermath of the crash. The crash had a direct and severe effect on people throughout metropolitan Washington.[25] It caused death and injury to people using the District's bridge to enter into the city. The consequent closing of both spans of the bridge jammed commute routes into the suburbs for hours and, with the coincidental Metro subway disruption, caused the federal government's Washington offices virtually to shut down for several days. The resources of District of Columbia and other rescue units were taxed, and the District no doubt incurred substantial expense in the course of the rescue and clean-up, not to mention the repair of its bridge.[26]

23. *See* note 13, *supra.*

24. The various district court cases involving "fortuitous crashes" and cited above turned to section 145 of the Restatement, Second for the contact to consider. They did not, however, make reference to sections 146 or 175, which are the special cases for personal injury and wrongful death actions, respectively. Each of these sections provides that the local law of the state where the injury occurred presumptively governs the issues of liability, unless another state has a more significant relationship to the event and the parties under the considerations of section 6.

25. Judicial notice may be taken of these facts. *See Chicago,* 644 F.2d at 615.

26. The District of Columbia has filed a claim against Air Florida to recover such expenses. Boeing is a third-party defendant in this case. *District of Columbia v. Air Florida,* Civil Action No. 82–2506.

Notwithstanding its location on the Virginia side of the Potomac, the operation of the Washington National Airport, through which, as noted elsewhere, the vast majority of those traveling by air come to the city, is of great concern to the District of Columbia as well. The municipality has a strong interest in seeing that ample air transportation is provided to its residents, as well as those who come to the city in the course of service to (or as) government officials, for business, or for tourism.

For these various reasons, the Court finds that the District of Columbia has a very strong interest in the application of its tort law principles to the question of Boeing's liability.

Nevertheless, the interest of Washington State in the resolution of this issue is evident as well. As the allegations against Boeing concern its conduct within the State of Washington, that state has, at the outset, a strong interest in the regulation of that conduct. That interest is strengthened further by the fact that Washington has made a legislative choice as regards the imposition of strict liability for design defects, after addressing how the issue concerns plaintiffs and corporate defendants doing business in Washington. *See* Washington Products Liability Act of 1981, Preamble, *supra.* The preamble to Washington's new products liability act demonstrates that state's interest in how the balance between providing remedies to plaintiffs and insuring the fiscal health of local corporate defendants is made. Indeed, as Boeing is one of the largest, if not the largest, employers in that state, Washington's interest in various issues relating to Boeing's products liability cannot be denied.

■ Yet, as regards the policies expressed in the preamble to the Washington Products Liability Act, the Court must examine how important the specific provisions of that act at issue here are toward effectuating those policies. The Washington Products Liability Act, according to Boeing, substantially duplicates the Uniform Products Liability Act, with the exception that it does not adopt the uniform law's rule providing for punitive damages. There is long-established policy in Washington against the award of punitive damages. *See Maki v. Aluminum Building Products,* 73 Wash.2d 23, 436 P.2d 186, 187 (1968) and cases cited therein. Washington considers the doctrine of punitive damages "unsound," *id.,* and has refused to change that rule by statute or decision. *See* Boeing's Memorandum on Punitive Damages, Nov. 16, 1982 at 17–18. Boeing, however, directs the Court's attention to no similarly strong expression of a policy choice regarding the standard of care governing design defects. Accordingly, it is evident that the statements in the preamble to the Washington act have more to do with the denial of punitive damages than with the rule on the standard for products liability. Consequently, the Court finds that the interest of Washington State with regard to the question of Boeing's alleged products liability is not as great as the interest of the District of Columbia, and as the District of Columbia has the most significant relationship to this issue, its law shall control.

## C. Apportionment of Liability

■ The jurisdictions interested in how fault is apportioned among the defendants follow two different rules on this subject. The District of Columbia and Virginia (which, it is argued, has an interest in apportionment because of the allegedly wrongful conduct of Air Florida and American Airlines which occurred there) both follow an equal-share rule, under which all culpable defendants contribute equal parts of the judgment, regardless of their relative fault.[27] Air Florida argues in favor of the law of either jurisdiction; American concurs. Florida, Texas, and Washington (the principal places of business of Air Florida, American, and Boeing, respectively) all follow a comparative fault rule under which each tortfeasor is assessed a portion of the judgment proportional to its relative culpa-

---

**27.** *Early Settlers Ins. Co. v. Schweid,* 221 A.2d 920, 923 (D.C.App.1966); *North River Ins. Co.* *v. Davis,* 274 F.Supp. 146, 149 (E.D.Va.1967), aff'd, 392 F.2d 571 (4th Cir.1968).

bility.[28] Boeing supports application of this rule.

The policies behind the equal-share rule are (1) that of encouraging each member of the community to conform to a standard of due care and (2) that of facilitating the determination of each defendant's share of the judgment. The first policy is one in which the District of Columbia and Virginia are interested in the instant case, in that injury and conduct took place in those jurisdictions. As the second policy concerns efficient judicial administration, it is an interest of the District of Columbia, as this is the forum for the majority of the individual actions. The rationale behind a comparative fault rule essentially is to make certain that all defendants are treated fairly. There is no doubt that Washington has an interest in seeing its law applied in that it certainly would be concerned that one of its local corporations, a defendant who is alleged to have done a wrong in Washington, be treated fairly among its co-defendants. Similarly, Florida and Texas would be interested in the fair treatment of their citizens.

Air Florida asserts that Florida, Texas, and Washington have no interest in the apportionment of fault where the injury was "extraterritorial" as to those states. However, as Boeing notes, the primary purpose of a comparative fault apportionment rule is not to punish or deter, but to ensure fair treatment of defendants. As such, with respect to this issue, a state where the conduct or injury took place is not necessarily the state of most significant relationship; rather, it is likely to be a state in which a protected defendant is located.

So it is with the instant case. The jurisdictions most interested in the application of the comparative fault rule are those in which the defendants are located. Moreover, applying this rule will not contravene the purposes of the rules of the other interested jurisdictions, the District of Columbia and Virginia, in that by apportioning responsibility in accordance with fault this rule, like the equal-share rule, serves the purpose of ensuring that parties act in conformance with a standard of due care. Indeed, by making sure that a highly-culpable defendant pays its fair share, rather than a per capita portion, which might be less, the comparative fault rule effectuates this policy even more completely and accurately than the older rule. As to the concern about the jury's ability to allocate fault upon a proportional basis, this Court is not convinced that a jury would be less equipped to entertain this task than it would be to consider other types of speculative matters typically assigned to juries. Finally, and most importantly, while applying the comparative fault rule in the instant case would not contravene the policies of the District of Columbia and Virginia, application of the equal-share rule would most certainly offend the legitimate and profound interests of the defendants' home states. The comparative fault rule will govern the apportionment of liability among the defendants.

### D. Punitive Damages

This issue has generated much interest among numerous parties, who have provided the Court with a plethora of suggestions as to which jurisdiction's law should govern the liability of the various defendants. The PSC argues that, because of the obvious contacts this litigation has with the District of Columbia, that jurisdiction's law, which allows punitive damages in survival actions but not wrongful death actions,[29] should apply. Alternatively, the PSC argues for the application of Florida law, because Air Florida trained its pilots and received Boeing's warnings and instructions for 737 op-

---

**28.** Fla.Stat.Ann. § 768.31(3)(a) (West Supp. 1981); Wash.Rev.Code § 4.22.040(1) (West Supp.1981); Tex.Stat.Ann. art. 2212a § 2 (Vernon Supp.1981).

**29.** *Runyon v. District of Columbia,* 463 F.2d 1319, 1322 (D.C.Cir.1972) (while punitive dam-

ages are available in survival actions, they are not available in wrongful death actions, where the sole purpose is to compensate). *See also Saigon,* 476 F.Supp. at 527 n. 13; D.C.Code §§ 12–101, 16–2701 (Michie 1981).

erators there. Florida permits punitive damage assessments in cases such as this.[30] Air Florida and American suggest that Virginia law, which would not allow punitive damages in this case,[31] should control their liability for punitive damages since the allegations as to their conduct relevant to this issue took place in that Commonwealth. Similarly, Boeing argues for Washington State's law to govern; as noted earlier, punitive damages would not be available under this law.[32] Plaintiffs Fako, Izzo, and Donahue assert that the laws of their decedents' domiciles, which also are their transferor courts' locations (Pennsylvania for Fako; Massachusetts for the others) should apply to those individual actions. Both Commonwealths allow punitive damages claims.[33] Finally, plaintiff Hamilton, a Maryland plaintiff, argues in favor of Florida punitive damages law. No party argues for the application of Texas law to American, but that state allows punitive damages.[34]

■ The primary purpose of imposing punitive damage assessments is to punish egregious conduct of a defendant and deter future wrongful conduct by the defendant and others, *not* to compensate a plaintiff. Consequently, a state whose only connection with this litigation is that it was the domicile of a plaintiff or victim has no interest in the imposition of punitive damage liability. *Chicago,* 644 F.2d at 612; *Jackson v. Koninklijke Luchtvaart Maatschappij N.V.,* 459 F.Supp. 953, 955–56 (S.D. N.Y.1978) (under California interest analysis, Pennsylvania punitive damages law would not apply to action involving crash of Dutch airliner in Spain, despite plaintiffs' domicile in that Commonwealth, because conduct causing the crash, being a local interest, was the concern of the jurisdiction in which the conduct occurred); *Sibley v. KLM-Royal Dutch Airlines,* 454 F.Supp. 425, 428–29 (S.D.N.Y.1978) (under Massachusetts choice of law rules, Massachusetts punitive damage law would not apply to same crash in *Jackson* despite plaintiffs' domicile in that Commonwealth, for same reason); *Hurtado v. Superior Court,* 11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106 (1974), W. Reese, *Airplane Accidents, supra,* at 1313, 1317.

■ Plaintiff Fako asserts that under the choice of law rules of the Commonwealth of Pennsylvania, which this Court must follow inasmuch as her action was transferred here from a federal court located there, Pennsylvania is the state most interested in the assessment of punitive damages. The cases cited by plaintiff Fako do not convince the Court that a Pennsylva-

**30.** *Martin v. United Security Services, Inc.,* 314 So.2d 765, 771–72 (Fla.1975) (Florida Wrongful Death Act of 1973, Fla.Stat.Ann. §§ 768.16–.27, did not repeal the right to claim punitive damages for negligently caused death).

**31.** Under the Virginia Death by Wrongful Act law as it existed on January 13, 1982, punitive damages were not available. Va.Code §§ 8.01–50, –52 (1967); *Wilson v. Whittaker,* 207 Va. 1032, 154 S.E.2d 124, 129 (1967) (since purpose of statute not to punish wrongdoers, punitive damages could not be assessed). This law was amended in 1982, after the date of the Flight 90 crash, to allow an assessment of punitive damages in the case of "willful or wanton conduct, or such recklessness as evinces a conscious disregard for the safety of others." Va.Code §§ 8.01–52(5) (Supp.1982).

**32.** As noted above, the Washington Supreme Court has held that "the doctrine of punitive damages is unsound in principle and [punitive damages] cannot be recovered in this jurisdiction, absent statutory authorization." *Maki v. Aluminum Building Products,* 436 P.2d at 187. *Accord, Kammerer v. Western Gear Corp.,* 96 Wash.2d 416, 635 P.2d 708, 711 (1981); *Barr v. Interbay Citizens Bank of Tampa, Florida,* 96 Wash.2d 692, 635 P.2d 441, 443–44 (1981). There is no statutory provision in the Revised Code of Washington allowing punitive damages awards in actions such as those before this Court.

**33.** *E.g., Focht v. Rabada,* 217 Pa.Super. 35, 268 A.2d 157 (1970). In Pennsylvania punitive damages are available even where compensatory damages are not awarded, and the amount of a punitive damages assessment need bear no relationship to actual damages awarded. *Rhoads v. Heberling,* —— Pa.Super. ——, 451 A.2d 1378, 1383 (1982).

Mass.Ann.Laws ch. 229 § 2 (Michie/Law Co-op. Cum.Supp.1982).

**34.** Tex. Const., art. 16 § 26; Tex.Stat.Ann., art. 4673.

354

nia court would depart from the settled rule and impose its punitive damages law in a case involving an extraterritorial tort. In *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), the Pennsylvania Supreme Court discarded the *lex loci delicti* rule in favor of a modern interest analysis approach, and ruled that the law of Pennsylvania (the decedent's domicile) should govern instead of that of Colorado (the *lex loci delicti*). However, the argument in *Griffith* concerned not the issue of the availability of punitive damages, but rather the *amount* of *compensatory* damages. Colorado law then imposed a limit on damage recoveries. In refusing to apply the Colorado limit, the Pennsylvania court noted that

> Pennsylvania's interest in the amount of recovery, on the other hand, is great .... Our commonwealth, the domicile of decedent and his family, is vitally concerned with the administration of decedent's estate and the well-being of the surviving dependents to the extent of granting full recovery, including expected earnings.

203 A.2d at 807. The court then cited a Pennsylvania constitutional provision guaranteeing "reasonable compensation for injuries to employees arising in the course of their employment." *Id.,* citing the relevant provision of the Pennsylvania Constitution. As such, the Pennsylvania court's decision concerned that Commonwealth's legitimate and substantial interest in ensuring adequate compensation for its citizens. Nowhere in that opinion did the Pennsylvania court suggest that Pennsylvania had any interest in the assessment of punitive damages. Similarly, the case of *Kuchinic v. McCrory,* 422 Pa. 620, 222 A.2d 897 (1966), also cited by plaintiff Fako, did not involve the issue of punitive damages but the question of whether Pennsylvania's simple negligence standard or Georgia's gross negligence rule should serve as the applicable standard of care. 222 A.2d at 899. Finally, the Third Circuit's opinion in *Scott v. Eastern Airlines, Inc.,* 399 F.2d 14 (3d Cir.), *cert. denied,* 393 U.S. 979, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968), the third case cited by

plaintiff Fako, similarly concerned Pennsylvania's interest in compensatory, rather than punitive, damages. 399 F.2d at 23. Accordingly, the Court is reassured that the conclusion reached by the court in *Jackson v. KLM* under the California choice of law rules applies here as well, *i.e.,* that under the interest analysis/"most significant relationship" rule of Pennsylvania, that jurisdiction would not be interested in the imposition of punitive damages in a case involving an out-of-state air crash.

▪ The Izzo and Donahue plaintiffs argue that a court in Massachusetts, from which their actions were transferred, would be guided by that Commonwealth's "most significant relationship" test to apply its rule allowing punitive damages. These plaintiffs cite Massachusetts' law governing punitive damages, which provides for a mandatory, minimum $5,000 assessment of punitive damages where a defendant is found to have acted maliciously, willfully, wantonly or recklessly, or to have been grossly negligent. Mass.Ann.Laws ch. 229, § 2 (Michie/Law.Co-op.Cum.Supp.1982). In support of their position, plaintiffs Izzo and Donahue quote the following portion of *Schulhof v. Northeast Cellulose, Inc.,* 545 F.Supp. 1200, 1206 (D.Mass.1982):

> Massachusetts has a strong interest in applying its punitive damage provision .... Its punitive damage provision represents a legislative decision that ordinary tort damages do not sufficiently deter "willful, wanton or reckless" acts causing death.

Izzo/Donahue brief, at 11–12. The Court disposes of the argument of plaintiffs Izzo and Donahue by noting the sentence counsel has excised from the portion of the *Schulhof* opinion quoted in their memorandum: *"As the place of the wrong,* [Massachusetts] has an interest in deterring behavior which causes injury and death *within its borders."* 545 F.Supp. at 1206 (emphasis added). The Court will follow the sound interpretation of Massachusetts' interest in the punitive damages issue set forth by the

Southern District of New York in the *Sibley* case.[35]

As the allegations against Air Florida and American refer to conduct before and upon takeoff from Washington National Airport, while those against Boeing primarily concern actions which took place in the State of Washington, the choice of law questions regarding these two groups of defendants must be examined separately. With regard to the conduct of Air Florida and American, the jurisdictions having some contact with this litigation relevant to the punitive damages issue are the District of Columbia (the site of injury), Virginia (the suggested locus of the alleged wrongful conduct), and Florida and Texas (the defendants' places of business).[36] In determining which of these jurisdictions has the greatest interest, great respect must be given to both the decisions to allow punitive damages and the decisions to deny punitive damages. *Chicago*, 644 F.2d at 615; *see also* Restatement (Second) of Conflict of Laws § 6.

In *Chicago*, the Seventh Circuit was forced to choose between the site of injury (Illinois, considered fortuitous but nonetheless interested, *see* 644 F.2d at 615; a state

denying punitive damages), the site of the airline's alleged misconduct (Oklahoma, the airline's maintenance base, which allowed punitives), the airline's principal place of business (New York, which denied punitives), and the center of the parties' relationship (Illinois and California, the origin and destination of Flight 191; both deny punitives). The court decided that since the interests of Oklahoma and New York were both very strong, it would not find one greater than the other. Consequently, it selected the law of the place of injury, Illinois, to govern the punitive damages question. *Id.* at 620–21.

In the instant case, Air Florida and American argue, persuasively, that as their conduct occurred outside of Florida and Texas, neither of those states would be interested in the regulation of such conduct.[37] Although a state might be more interested in punishing extraterritorial conduct of one of its citizens than avenging harm caused to one of its citizens outside of its borders, for many of the same reasons, it is evident that jurisdictions having a greater interest in this issue would be those where the conduct or any non-fortuitous

---

**35.** The Court wishes to emphasize its displeasure with counsel's misrepresentation of the legal conclusions reached by the United States District Court for the District of Massachusetts. For counsel to "[k]nowingly make a false statement of law or fact" is a violation of the Code of Professional Responsibility and will not be tolerated. Model Code of Professional Responsibility DR 7–102(a)(5); Rules of the Supreme Judicial Court of Massachusetts, —— Mass. —— (1981). The negligent making of a false statement of law or fact is also reprehensible. It should be noted that counsel for these plaintiffs moved for leave to file their brief and to present oral argument only several days before the hearing, after hundreds of pages of briefing had been filed by the other parties over the course of a number of weeks. Every court should be able to rely upon the accuracy of the statements made by members of the Bar—and indeed, given the limited resources of a judge's staff, must be able to do so without hesitation. *Vargas v. McNamara*, 608 F.2d 15, 19 (1st Cir. 1979). The rule cited above serves in part to protect this interest. The fact that the deleted language, which concerns a material issue, was removed from within the quoted passage rather than merely dropped from the end of the quota-

tion suggests that the omission may not have been inadvertent. Counsel, accepting responsibility for the omission, has represented that he had no intent to mislead the Court. No disciplinary action will be initiated; however, this misquotation calls for strong condemnation. *Quality Molding Co. v. American National Fire Ins. Co.*, 287 F.2d 313, 315–16 (7th Cir.), *cert. denied*, 368 U.S. 826, 82 S.Ct. 45, 7 L.Ed.2d 29 (1961).

**36.** To the extent that it can be determined where the relationship between the parties is centered, that place is the District of Columbia. *See* note 13, *supra*.

**37.** In a case where a Texas-domicile defendant corporation allegedly engaged in conduct in Illinois also causing injury in Illinois, the Fifth Circuit decided that since the tort remedy's primary purpose was to deter or punish, Illinois, as the state where the conduct took place, was the "state of dominant interest and thus that of most significant relationship." *Houston North Hospital Properties v. Telco Leasing*, 688 F.2d 408, 409 (5th Cir.1982), quoting Restatement (Second) of Conflict of Laws § 145, comment b on subsec. (1), at 416.

injury took place. In the instant case, with respect to the actions of Air Florida and American, as the "corporate accountability" interests of Florida and Texas are lessened, the most interested jurisdictions are the District of Columbia and Virginia.

With regard to the conduct of Air Florida and American as alleged in the instant case, the District of Columbia and the Commonwealth of Virginia have a concurrent regulatory interest. As the allegations of wrongful conduct on the part of Air Florida's flight crew include their actions throughout the takeoff procedure (including decisions as to how much thrust to apply, and so on, while airborne), those allegations embrace conduct which could have taken place over either jurisdiction. Apart from that conduct which could actually have taken place in either or both jurisdictions, the District of Columbia shares with Virginia an interest in the safe operation of the airport—especially where the activities sought to be regulated are fraught with the potential for physical injury within the District and other damage or disruption to the commerce and public order of the municipality.

■ Between the District of Columbia and the Commonwealth of Virginia, the District of Columbia has the most significant relationship to this issue. As noted earlier, the injurious effects of the conduct were predominantly felt in the District of Columbia. Victims were rushed by rescue units stationed in the District of Columbia to hospital and other facilities within the District. The city's bridge was damaged. While commerce in most parts of Virginia proceeded as usual after the crash, business in the District of Columbia was brought to a standstill. Moreover, the fact that Virginia recently has changed its position on the denial of punitive damages and now will permit an assessment thereof is strongly suggestive that denying punitive damages was not a very significant policy concern of the Commonwealth at the time of the crash. Accordingly, the law of the District of Columbia will control the question of the liability of Air Florida and American for punitive damages.[38]

In light of the foregoing analysis, the Court now considers Boeing's liability for punitive damages. There is no doubt that the State of Washington, the site of the alleged wrongful conduct (the designing of the 737) and Boeing's principal place of business is an interested jurisdiction. *See Chicago,* 644 F.2d at 614; Reese, *Airplane Accidents,* 39 Wash. & Lee L.Rev. at 1313. The PSC, as noted above, suggests that the District of Columbia, as the site of the injury, has the most significant relationship as to this issue.

In *Chicago,* the Seventh Circuit selected the law of Illinois, the site of injury, to govern the question of the manufacturer's liability for punitive damages. However, in doing so, the court expressly stated that Illinois' interest in the question was less than that of both California, the state where the plane was designed and built, and Missouri, the manufacturer's principal place of business. 644 F.2d at 615. Because California and Missouri were in conflict on the issue (the former would not allow an assessment of punitive damages, while the latter would), the *Chicago* court was unable to resolve the issue on interest

**38.** This is consistent with the Reese approach, which suggests that the three potentially interested jurisdictions in an action by a passenger for punitive damages against a carrier are (1) the carrier's place of business, (2) the place where the plane was maintained, in a case where the injury resulted from a failure to inspect or repair the plane, and (3) the place of navigational error, in a case where the injury resulted from such error. Reese, *Airplane Accidents, supra,* at 1317–18. As discussed above, Florida and Texas have a lessened interest in this issue because the allegedly wrongful conduct took place outside of their borders. Site (2) applies to the allegations against American, and refers to National Airport. Site (3) applies to Air Florida, and similarly refers to National Airport. As the District of Columbia and Virginia together are concerned with the regulation of conduct at National Airport they both therefore have an interest in the application of their laws. Between them, as injury was felt primarily in the District of Columbia, the District has the more significant relationship to the issue.

analysis alone. *Id.* Nor could it arrive at a "moderate and restrained" interpretation of the relevant policies that would allow such resolution. *Id.* Instead, it simply turned to the law of the site of injury to break the tie. *Id.* at 616. In using Illinois law to tip the balance, the court noted that in light of the nature of the alleged defect (an engine mount prone to cracking), "[t]hat the injury occurred in Illinois can only be described as fortuitous." *Id.* at 615. The court observed:

> Because the place of injury is much more fortuitous than the place of misconduct or the principal place of business, its interest in and ability to control behavior by deterrence or punishment, or to protect defendants from liability, is lower than that of the place of misconduct.

*Id.* With respect to a manufacturing or design defect, unlike the case of a navigational error, the place of injury is almost always fortuitous. *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d at 527–28.[39]

However, the inquiry as to the interest of the state of injury has two components: the state's connection with the defendant alleged to have caused the injury (explored by the Seventh Circuit in its conclusion that the site of the *Chicago* crash was fortuitous) and the state's connection with the injury itself. In considering the latter component, the Seventh Circuit recognized that the fact that the interest of the place of injury in *Chicago* was less than that of the places of the manufacturer's business headquarters and the alleged misconduct "does not mean that Illinois has *no* interest in the punitive damages question." 644 F.2d at 615. Illinois, like the District of Columbia in the instant case, had "very strong interests in not suffering air crash disasters and also in promoting airplane safety." *Id.* The court also took judicial notice of the fact that "the DC–10 crash sent shock waves throughout the metropolitan Chicago area," as the Flight 90 crash did in the District of Columbia, and noted that Illinois incurred great expense in the course of performing its rescue, clean-up, and other functions related to the disaster. *Id.* Moreover, the court noted that under the Restatement, Second, of Conflict of Laws, as interpreted by the forum (Illinois), "presumptive importance" is given to the place of injury. *Id.,* at 616, citing Restatement (Second) of Conflict of Laws § 175.[40]

---

**39.** *Pittway* was an action against a manufacturer for cost of repairing an airplane's cracked mainframe and for economic loss. There was no crash in this case, but the owner was forced to put its plane out of service when the crack was discovered while the plane was on the ground in Wisconsin. As such, the location of the aircraft at the time the crack occurred was indeterminable. 641 F.2d at 524.

Even if the court were able to fix the site of injury, however, the court stated that it "could not agree that it is the state with the most significant relationship to the litigation." *Id.* at 528. Noting that the Restatement, Second, of Conflict of Laws provides, at § 145, subsec. 2, comment (b), that where the place of injury is indeterminate or fortuitous, the law of the place of misconduct should be given greater weight, the court concluded that the law of Georgia, where the plane was built, should control. 641 F.2d at 528.

**40.** Section 175 states that the law of the site of injury determines the "rights and liabilities of the parties" unless some other state has a more significant relationship under the principles of section 6 to the occurrence and the parties. However, it concerns the law generally to be applied in wrongful death actions, and does not specifically refer to the question of liability for punitive damages. Indeed, section 175, comment (f), which discusses the case where conduct and injury occur in different states, suggests that the injury state's law is most likely to be applied where the decedent had a settled relationship to that state (*e.g.,* was a domiciliary or resident thereof). This suggests a concern with compensation, which is not a factor in the issue of imposing punitive damages. *Compare* Reese, *Airplane Accidents, supra,* at 1313, wherein the author suggests that the two jurisdictions which properly have an interest in the imposition of punitive damages in a case by a passenger against a manufacturer are (1) the place of manufacture or design, and (2) the manufacturer's principal place of business. Professor Reese notes that while the state where the crash occurred "could also be said to have an interest in deterring the manufacture of defective planes ... [it] might, however, have no substantial relation to either the producer or the passenger." *Id.* at 1314. This suggests that the Reese formula would include the state of injury in this list in a case where these parties in fact have a connection with that jurisdiction. In a third person's (bridge plaintiff's) action against a manufacturer, the

In the instant case, the District of Columbia's stake in the question of the manufacturer's liability for punitive damages is greater than that of Illinois in *Chicago.* In *Chicago,* since Illinois did not impose punitive damages, that state would not have been disturbed by the application of California's equivalent law to that action. On the other hand, applying Missouri law would not have concerned it either, inasmuch as Illinois, as home of none of the defendants, had no interest in shielding any party from punitive damages. In the instant case, however, the policies of the District of Columbia of preventing air disasters and promoting safe air travel are advanced by the District's decision to allow punitive damage assessments in actions such as this. Those policies would be offended by the application of a law such as the State of Washington's, which denies such awards.

Nevertheless, despite these apparently significant interests of Illinois (which the District of Columbia certainly holds in greater measure in the instant case) the court found that the concerns of California and Missouri were of sufficiently great importance to supplant Illinois' interest. A second look at the other component of the inquiry as to the interest of the state of injury, that state's connection with the defendant manufacturer, is necessary to understand why the *Chicago* court reached this conclusion. The Seventh Circuit noted in *Pittway Corp. v. Lockheed Aircraft Corp.* that a manufacturer often will be determined not to have any substantial contact with the site of injury since the fact that the injury occurs at a particular place usually has little relationship to the type of conduct in which the manufacturer is alleged to have been engaged. As a result, the jurisdictions with the greatest connection with the manufacturer's conduct frequently will be those in which the actual conduct occurred (the place of manufacture or design) or the place where ultimate re-

sponsibility for that conduct lies (the manufacturer's principal place of business). This was the case in *Chicago.* But this will not always be so. It must be kept in mind that the inquiry as to the site of conduct is not an end in itself but a means of determining the manufacturer's connections with the various states interested in the litigation, including the state of injury. This embraces some due process considerations: could the manufacturer foresee that a certain state's law would be applied to its conduct? Reese, *Airplane Accidents,* at 1311–12. For example, in the case of the Oklahoma to Utah flight in *Bruce v. Martin-Marietta, Corp.,* discussed above, the manufacturer had no reason to expect that its aircraft would crash in Colorado, as it did, rather than any other state through which it passed enroute. In the instant case, on the other hand, although Boeing's conduct conceivably could have caused injury wherever a 737 took off under circumstances similar to those present at Flight 90's departure, the fact the likely places of resultant harm are limited to areas around commercial airports renders the site of injury in this case, with respect to Boeing, less fortuitous than the injury sites in cases such as *Bruce v. Martin-Marietta, Corp.*

Boeing has a much more substantial relationship to the District of Columbia than a manufacturer generally has to the site of injury in a typical "fortuitous crash" case. It reasonably could have foreseen, and no doubt desired, that its short-haul 737 aircraft would be used for flights out of Washington National Airport, one of the nation's busiest airports and a station limited by federal regulation to flights shorter than 1,000 statute miles. *See* 14 C.F.R. § 159.60 (1982). As the allegations against Boeing concern the aircraft's performance upon departure, it would not be unreasonable to hold Boeing, with respect to the issues of this case, to the standards of the District of Columbia. Moreover, the allegations in-

same states would be the "most substantial[ly]" interested. *Id.* at 1320. The state where the injury happened is not included on this list because while that state would be very interested in securing sufficient compensation

for his injuries, it might have a "slight or fortuitous" contact with the manufacturer. *Id.* at 1320–21. Again, this suggests that the manufacturer's contact will not invariably be fortuitous.

clude not only that the plane was defectively designed but that Boeing failed to make proper warnings to Air Florida about the craft's takeoff performance under certain conditions. This lends further support to the position that Boeing's nexus to the litigation is not confined to the State of Washington.

For these reasons, in this case, unlike the *Chicago* case, it cannot be said that the state of injury necessarily has a lesser interest than the state in which the defendant's conduct occurred or its principal place of business was located. To resolve the conflict between the laws of the District of Columbia and the State of Washington, the Court now considers the policies behind those laws relevant to the substantive question of Boeing's liability for punitive damages.

■ Between the District of Columbia and the State of Washington, the former has the greater interest in the question of Boeing's liability for punitive damages in the instant litigation. While Washington State has made a considered choice not to allow the assessment of punitive damages, that choice necessarily includes a balancing of the interests of resident tortfeasors against the interests of that state in preventing harm caused by tortious conduct. Yet while Washington State, through its legislature, may weigh the rights of its own injured victims against its resident tortfeasors, the sovereignty of other states prevents it from placing on that scale the rights of those injured elsewhere. Accordingly, with respect to those actions in this litigation originally filed in jurisdictions following interest analysis choice of law principles, the law of the District of Columbia shall govern the question of Boeing's liability for punitive damages.

## II. Choice of Law in Cases Transferred from Virginia, Georgia, and Maryland

Since interest analysis directs that the law of the District of Columbia is applicable to all issues but apportionment of liability, the law that shall govern actions subject to the *lex loci delicti* rule can possibly differ only with respect to that issue.

### A. Virginia

■ The highest court of Virginia recently has reaffirmed its adherence to the *lex loci delicti* rule. *McMillan v. McMillan,* 219 Va. 1127, 253 S.E.2d 662, 663 (1979). Consequently, the law of the District of Columbia shall govern all issues in the action transferred from the Eastern District of Virginia.

### B. Georgia

In determining what choice of law principles to apply to the action transferred from the United States District Court for the Northern District of Georgia, this Court must resolve the issue as the courts of the State of Georgia would. *Imperial Enterprises, Inc. v. Fireman's Fund Insurance Co.,* 535 F.2d 287, 290 (5th Cir.1976). Although this Court is bound by the decisions of Georgia courts, *Wansor v. George Hantscho Co., Inc.,* 595 F.2d 218, 220 n. 7 (5th Cir.1979), it is not "immutably" required to follow Georgia state court decisions where it appears that the Georgia Supreme Court, if considering the same questions, would not rely upon such decisions as precedent. *Hood v. Dun & Bradstreet,* 486 F.2d 25, 31 (5th Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1580, 39 L.Ed.2d 882 (1974). This Court may make an educated guess as to what the Georgia courts would decide today. *Trail Builders Supply Co. v. Reagan,* 409 F.2d 1059, 1061 (5th Cir.1969).

It is by no means certain that the Georgia Supreme Court would today follow the doctrine of *lex loci delicti* in a case such as this. The United States District Court for the Northern District of Georgia, when recently faced with the question of what choice of law principles Georgia would use in a tort case stated that "the law of the place of the wrong—*lex loci delicti*—has always been the choice of law rule in this state." *Harris v. City of Chattanooga,* 507 F.Supp. 374, 376 (N.D.Ga.1981). However, the *Harris* court made no analysis of the contemporary state of Georgia law on the subject, the language quoted immediately above being the full

extent of its discussion of the issue, and cited no other authority than a 1952 decision of the Georgia intermediate appellate court: *Craven v. Brighton Mills, Inc.,* 87 Ga.App. 126, 73 S.E.2d 248 (1952). In *Craven,* the Georgia Court of Appeals applied the *lex loci delicti* rule in consideration of a 1945 decision of that court and a 1908 Georgia Supreme Court opinion. 73 S.E.2d at 251. In the latter case, *Lay v. Nashville C. & St. L. Ry. Co.,* 131 Ga. 345, 62 S.E. 189 (1908), the court gave no explanation for its application of the *lex loci* approach, evidently because this was the prevailing rule at the time.[41] Research reveals no decision of the Georgia Supreme Court since the date of *Craven* addressing the question of the law to be applied in tort cases.

More recently than *Harris,* the District Court for the Northern District of Georgia has held that although the Georgia courts had not expressly addressed the question of whether to discard the *lex loci* rule in contracts actions, the "strong implication" was that Georgia would now follow the relevant theories of the Restatement, Second, of Conflict of Laws. *Ryder Truck Rental, Inc. v. St. Paul Fire & Marine Insurance Co.,* 540 F.Supp. 66, 68 (N.D.Ga.1982). Boeing suggests that this indicates that the Georgia courts would now also be receptive to applying the modern choice of law principles in tort actions as well.

In *Boston,* that court was presented with a similar situation in regard to the law applicable to actions originally filed in Vermont. The court noted that the most recent case in which the Vermont Supreme Court had applied the *lex loci delicti* rule was a 1961 ruling, decided before the Restatement, Second and some 14 years before the *Boston* court was presented with the issue. 399 F.Supp. at 1109. In the interim, however, Vermont had adopted the Restatement, Second approach in contract actions. *Id.* at 1108, 1110. This decision provided the *Boston* court with "persuasive evidence" that the *lex loci delicti* rule would no

longer be valid law in Vermont tort actions. *Id.* at 1110. Accordingly, the court applied the Restatement, Second interest analysis to the Vermont actions before it.

Nonetheless, the *Boston* court was not as fortunate as is this Court to have before it a recent decision of the transferor court discussing which state's choice of law rules would apply in an aviation case. *Baltimore Football Club, Inc. v. Lockheed Corp.,* 525 F.Supp. 1206 (N.D.Ga.1981) was an action involving facts almost identical to those in *Pittway Corp. v. Lockheed Aircraft Corp.,* noted above: a Lockheed Jetstar built in Georgia developed cracks in its mainframe somewhere during its travels, which were only discovered while the plane was on the ground in Wisconsin. As in *Pittway,* this was an action for damage to the aircraft, and there being no crash, the site of injury could not be determined. The court then considered the contacts analysis employed by the Seventh Circuit in *Pittway,* which it found "most persuasive." *Id.* at 1208. The court noted that "[w]hile Georgia courts do not follow the 'most significant relationship test' [employed in *Pittway* ], ... there is some room for policy considerations in a conflicts of law decision. Georgia courts will not enforce foreign statutory law in tort actions where the foreign law is contrary to Georgia's public policy." *Id.* at 1209 (citations omitted).

Although the *Baltimore Football* court's analysis of Georgia choice of law principles might be considered dicta inasmuch as that case had been transferred from a Wisconsin federal court on the defendant's motion and therefore was necessarily governed by the laws of that state, it nonetheless persuades this Court that it would be inappropriate at this time to rule that *lex loci delicti* is no longer the rule in Georgia tort actions. Indeed, the precedents which guided the *Ryder Truck* court toward departing from *lex loci* in that contract case were in existence at the time the *Baltimore Football* case was

---

41. Ironically, in neither *Lay* nor *Craven* was the law of the *loci delicti* applied, because inasmuch as the laws of those states (Alabama and South Carolina, respectively) were not pleaded specifically, the common law as interpreted by the courts of Georgia was to be followed. *Lay,* 62 S.E. at 189; *Craven,* 73 S.E.2d at 251.

being considered by the District Court for the Northern District of Georgia. *Ryder Truck,* 540 F.Supp. at 68–69.

 This does not answer the entire question of what law should govern the action transferred here from the Georgia federal court. As noted in a portion of *Baltimore Football* quoted above, Georgia will not follow foreign laws in conflict with its own policy. Unlike the District of Columbia, Georgia has a comparative fault rule for contribution among tortfeasors. Ga.Code Ann. § 105–2011 (1968); *Greyhound Lines, Inc. v. Cobb County, Ga.,* 523 F.Supp. 422, 424 (N.D.Ga.1981), *aff'd,* 681 F.2d 1327 (11th Cir.1982). The policy behind such a rule, as noted earlier, includes the forum's interest in fair treatment of all parties. It therefore is evident to this Court that a Georgia court would not apply the District of Columbia's equal-share rule to this action; consequently, while all other issues in this particular action shall be determined by the law of the District of Columbia, the Georgia rule of apportionment by comparative fault shall govern the liability of the various defendants.

### C. Maryland

In determining what law should govern actions transferred from the Maryland federal court, this Court must attempt to determine what the highest Maryland state court would hold were that court faced with the issues present in the instant action. *Sherby v. Weather Brothers Transfer Co.,* 421 F.2d 1243, 1244 (4th Cir.1970). A state court decision may lose its persuasive force without having been overruled expressly; such a decision need not be followed by a federal court if the state court would not do so. *See, e.g., Boston,* at 1109; *see generally Snyder v. Hampton Industries, Inc.,* 521 F.Supp. 130, 137 (D.Md.1981).

The most recent statement of Maryland's highest court on the issue of choice of law principles was in 1975 when the Court of Appeals of Maryland noted that "the rule of *lex loci delictus* is applicable in tort actions brought in Maryland." *Fricks v. General Motors Corp.,* 274 Md. 288, 336 A.2d 118, 123 (1975). Yet the court did not embark upon any analysis of the continued utility of the *lex loci* rule beyond making the above statement and, moreover, refused to consider the law of the injury state (North Carolina) on appeal, inasmuch as the parties who had sought to rely on that law did not specially plead it as required by a Maryland statute. *Id.*[42]

*White v. King,* 244 Md. 348, 223 A.2d 763 (1966), cited by the *Fricks* court, 336 A.2d at 123, as authority for the use of the *lex loci* rule in Maryland, was a case in which the court considered, but elected not to adopt, the interest analysis approach found in the then-new Ninth Tentative Draft of the Restatement, Second. The court noted contemporary criticism of *lex loci delicti,* 223 A.2d at 765, and "recognize[d] the force" of arguments in favor of the Restatement proposal, whose features it discussed in detail. *Id.* 223 A.2d at 765–67. Nevertheless, because the new doctrine was "still in the process of development" and would benefit from "clarification on case-to-case decisions, as its application to different factual situations [would] present[ ] new difficulties to be resolved and new factors to be weighed," the Maryland court concluded that it would defer change to the legislature "until what we deem a sound, practical alternative is evolved." *Id.* 223 A.2d at 767.

Unlike the courts of Virginia and Georgia, the Maryland court left the door open to adopting the modern approach at an appropriate time. Citing *White v. King,*

---

**42.** In two recent decisions, the United States District Court for the District of Maryland has stated that *lex loci delicti* is Maryland's choice of law rule in tort cases. *Grodinsky v. Fairchild Industries, Inc.,* 507 F.Supp. 1245, 1252 (D.Md.1981); *President & Directors of Georgetown College v. Madden,* 505 F.Supp. 557, 569 (D.Md.1980). However, in neither of those cases did the court examine the question of whether Maryland would still follow that rule in light of *White v. King* and subsequent developments; moreover, those cases predate the Maryland intermediate appellate decision in which *lex loci delicti* was not followed, which case is discussed in text below.

the Maryland intermediate appellate court recently found no difficulty departing from the *lex loci delicti* rule in determining what law would govern a workers' compensation case. *Connor v. Hauch,* 50 Md.App. 217, 437 A.2d 661, 662 (1981). In performing what essentially was an analysis of the interests of the two states having some connection to the matter, the court noted that to apply the law of Delaware (the site of injury), which would defeat the action, "would be obnoxious to the public policy of Maryland." 437 A.2d at 665. In addition, the litigation was "not concerned" with the law of Delaware. *Id.*

Accordingly, the fact that the Maryland Court of Special Appeals, considering *White v. King,* believed itself unfettered to perform an analysis of the states' interests in the litigation strongly suggests that the rule of *lex loci delicti* in tort actions, questioned by the highest court of Maryland as early as 1966, no longer has vitality in that state and that the Court of Appeals of Maryland would not apply it were the instant matters now before it. Therefore, the law governing any action transferred to this Court from Maryland shall be the same as the relevant law governing those other actions subject to the analysis in Part I of this Memorandum Opinion.

An Order consistent with the foregoing accompanies this Memorandum Opinion.

### ORDER

Consistent with the Memorandum Opinion issued in this proceeding this date, the following principles shall govern the consolidated trial on liability issues to commence March 31, 1983:

1. With respect to actions originally filed in the District of Columbia, the States of Illinois, Maryland, and Texas, and the Commonwealths of Massachusetts and Pennsylvania, the law of the District of Columbia shall govern the issues of (a) negligence of any party, (b) products liability of defendant Boeing, and (c) liability of all defendants for punitive damages. With respect to these actions the law of the States of Florida, Texas, and Washington shall govern apportionment of liability or contribution among defendants.

2. With respect to actions originally filed in federal or state courts in the Commonwealth of Virginia, the law of the District of Columbia shall govern all issues.

3. With respect to actions originally filed in federal or state courts in the State of Georgia, the law of the District of Columbia shall govern all issues except apportionment of liability or contribution among defendants, which issue shall be controlled by the law of the State of Georgia.

SO ORDERED.

United States District Court, N.D. Georgia, Atlanta Division.